## IN THE UNITED STATES DISTRICT COURT
## THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* ANN KEATING | ) ) ) | Civil Action No.   2:16-cv-875 |
| Plaintiffs, | ) ) | Judge  Sargus |
| v. | ) ) | Magistrate Judge Jolson |
| | ) | **FILED UNDER SEAL PURSUANT TO** |
| LONDON BRIDGE TRADING CO. LTD., ATLANTIC DIVING SUPPLY, INC., and DAVID BOHANNON | ) ) ) | **31 U.S.C. § 3730(b)(2)** |
| | ) | **DO NOT SERVE** |
| Defendants. | ) ) ) | |

## COMPLAINT

### I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from the false claims submitted for payment by London Bridge Trading Company, Ltd. ("LBT"); its President, Mr. David Bohannon; and Atlantic Diving Supply, Inc. ("ADS") (collectively, "Defendants"), in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").

2.    Since at least 2008, Defendants have submitted, or caused to be submitted, false claims in connection with the sale of "American-made" products that are actually manufactured in foreign countries, including Peru, Mexico, and China.  Defendants, who market their goods as "100% made in America," conceal their products' true places of manufacture by removing the manufacturers' tags and replacing them with tags that read "Made in USA."

3.    The United States, primarily through the Department of Defense, directly purchases a variety of textile-based products from Defendant LBT, including clothing, armor,

boots, belts, bags, rope, slings, backpacks, and medical pouches. Defendant LBT also supplies

products to the United States through subcontracts with companies such as, *inter alia*, Defendant

ADS, which also transacts substantial amounts of business with the United States through the

Department of Defense.

4.      Defendants also offer their products for sale to all federal agencies on the

government-owned website "GSA Advantage!," which permits government agencies throughout

the United States to purchase products from contracted vendors.

5.      Congress has enacted laws, including the Buy American Act ("BAA"), 41

U.S.C.S. § 8301 *et seq.*, the Trade Agreements Act ("TAA"), 19 U.S.C. § 2511 *et seq.*, and the

Berry Amendment, 10 U.S.C.S. § 2533a, to ensure that public expenditures give preference to

American businesses and American-made products. Compliance with these laws is material to

the government's decision to pay claims, and the government incorporates and requires

compliance with these laws in its procurement contracts. A supplier who submits a claim for

payment under such contracts represents that the products provided to the government comply

with the conditions set forth by the BAA, the TAA, or the Berry Amendment.

6.      Relator seeks to recover damages and civil penalties under the FCA arising from

Defendants' presentation of false claims to the United States in connection with the sale of non-

American made products whose true places of manufacture Defendants knowingly concealed

and falsely represented.

## II.     PARTIES

7.      The United States is the real party of interest to the claims set forth herein. Ann

Keating brings this action as a relator on behalf the United States and herself, pursuant to the *qui*

*tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).

8.     Relator Ann Keating is a resident of Virginia Beach, VA.  She has been employed by London Bridge Trading Company, Ltd., since May of 2002 and has actual, first-hand knowledge of the false statements and false claims presented by the Defendants to the government, as alleged herein.  Ms. Keating also has a profound interest in the safety of and security of the United States military.  In 2004, Ms. Keating's son Jeremiah was killed while serving in Iraq.  Most of her remaining family members also have military ties.  She believes that Defendants' scheme is a threat to their safety and the integrity of U.S. military operations.

9.     Defendant London Bridge Trading Company, Ltd. ("LBT") is a Virginia corporation headquartered in Virginia Beach.  LBT regularly conducts business with the United States and the Department of Defense, both directly as a prime contractor and indirectly as a subcontractor.  LBT sells a variety of textile-based tactical products for military use.

10.     Defendant David Bohannon is the president of London Bridge Trading Company and son-in-law of its previous president and founder.  Mr. Bohannon started with the company in 2000, and under his direction the volume of LBT's business increased dramatically.  He has also cut the size of LBT's workforce nearly in half since 2011 and decreased the work hours of the remaining staff.  Mr. Bohannon is also president of Southwest Tactical, a company associated with LBT near El Paso, TX.

11.     Defendant Atlantic Diving Supply, Inc. ("ADS") is a Virginia corporation also headquartered in Virginia Beach.  ADS regularly conducts business with the United States and the Department of Defense.  ADS sells a variety of products intended for military use, including products that ADS sources from Defendant LBT.  When ADS contracts with the United States, the requirements imposed by the BAA, the TAA, and the Berry Amendment flow down to its subcontractors.

### III.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31, United States Code.

13.    This Court has personal jurisdiction over the Defendants because they transact business in this district and throughout the United States

14.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district and throughout the United States, and because they submit claims through the Defense Finance and Accounting Service located in Columbus, Ohio.

15.    This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

16.    Relator is an original source as defined by 31 U.S.C. § 3730(e)(4)(B).  She has direct and independent knowledge of information that materially adds to any prior disclosures and has voluntarily provided this information to the government before filing the instant action.

### IV.    LEGAL & REGULATORY BACKGROUND

17.    The False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim.  Violators are liable to the United States for a civil penalty of not less than $10,781 and not more than $21,563 per claim, plus three times the amount of damages sustained by the government.  31 U.S.C. § 3729(a)(1).

18.     The FCA defines "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

19.     The Buy American Act ("BAA") requires the United States to prefer procurement of "domestic end products," which the law defines as products that are (a) manufactured in the United States; and (b) comprised substantially of components that are grown, mined, produced or manufactured in the United States. 41 U.S.C.S. § 8302(a); FAR § 25.200; DFAR § 225.101.

20.     The BAA was enacted in 1933 to strengthen the economy and protect American workers by promoting domestic manufacturing and encouraging new industry.

21.     In practice, the BAA is enforced as a "pricing penalty" rather than an outright ban. A contractor's offer to sell foreign products to the Department of Defense is evaluated as though its cost was 50% over the offered price. DFAR § 225.502(c)(ii)(E).

22.     The BAA applies to purchases above the "micro-purchase threshold," which was $3,000 until July 2, 2015, when it increased to $3,500. 41 U.S.C. § 8302 (a)(2)(B); FAR § 25.100(b)(1); 41 U.S.C. § 1902.

23.     To comply with the BAA, government contracts specify that "[t]he Contractor shall deliver only domestic end products" to the United States. FAR § 52.225-1 (implementing language as required by FAR § 25.1101). If the contractor wishes to supply non-domestic end

products to the United States, the contractor must identify, by proposed contract line item, all foreign end products that are included in its offer and their country of origin. *Id.*

24. When making an offer to sell products to the United States, suppliers must also expressly certify that "each end product [supplied to the government]… is a domestic end product" or submit a certificate of non-compliance, specifying by line item and country of origin the products that are not domestic end products. FAR § 52.225-2 (implementing language as required by FAR § 25.1101). A contractor's failure to do so disqualifies it from eligibility for the contract, and a contractor who falsely so certifies cannot lawfully seek payment from the United States.

25. Pursuant to the Trade Agreements Act ("TAA"), 19 U.S.C. § 2511 *et seq.*, contractors must supply the government with goods that are either wholly manufactured or "substantially transformed" in the United States or countries with which the United States has entered into certain trade agreements ("TAA Countries").

26. The TAA applies to acquisitions that exceed a certain dollar threshold, and TAA Countries receive non-discriminatory treatment under the BAA. FAR § 25.402. Here, the relevant thresholds are currently $191,000 for Peru and $77,533 for Mexico. *Id.* China is not a TAA Country, and the United States has no trade agreements with China that would affect the requirements implemented by the BAA.

27. To comply with the TAA, government contracts specify that "[t]he Contractor shall deliver only U.S.-made or designated country end products" to the United States. FAR § 52.225-5 (implementing language as required by FAR § 25.1101). If the contractor wishes to supply products from non-designated countries, the contractor's initial offer must specifically identify, by proposed contract line item, all foreign end products that are included in its offer and

state their country of origin.  FAR § 52.225-6 (implementing language as required by FAR §

25.1101).  A contractor's failure to do so disqualifies it from eligibility for the contract, and a

contractor who falsely so certifies cannot lawfully seek payment from the United States.

28.     The Berry Amendment is a separate statutory regime.  It prohibits the Department

of Defense from procuring, *inter alia*, clothing, fabrics, fibers, and other textile products that are

not grown or manufactured in the United States or another "qualifying country."  10 U.S.C.S. §

2533a, DFAR § 225.7002-1(a).  Unlike the BAA, the Berry Amendment functions as an outright

ban rather than a pricing preference.

29.     Neither Peru, Mexico, nor China are "qualifying countries" for purposes of the

Berry Amendment.  DFAR § 225.003(10) (definition of "qualifying country"); DFAR

§ 225.7002-3, implementing language in DFAR § 252.225-7012.

30.     The Berry Amendment was formally codified in 1992 after being included in

every annual defense appropriations act since WWII.  Its purpose is to maintain, support, and

protect American troops and the U.S. industrial base for the particular items covered by the

Berry Amendment.

31.     The Berry Amendment applies to purchases above the "simplified acquisition

threshold," which was $100,000 until October 2010, when the threshold was adjusted to

$150,000.  Whether a contract surpasses this threshold is determined by the value of the prime

contract between the government and the prime contractor, rather than the piecemeal value of

subcontracts.

32.     Textiles covered by the Berry Amendment are not provided non-discriminatory

treatment through the TAA, even if they would be treated non-discriminately when purchased by

a federal agency other than the Department of Defense.  DFAR § 225.401-70.  In other words, no

free trade agreement can relieve suppliers from their obligation to provide the Department of Defense with textile-based products from "qualifying countries."

33.     Unlike the BAA and the TAA, the Berry Amendment does not allow suppliers to submit certificates of noncompliance because noncompliant products are ineligible for procurement. Thus, submission of claims for noncompliant products violates a fundamental term of the supplier's contract with the United States.

34.     To comply with the Berry Amendment, government contracts state that suppliers "shall deliver under this contract only such of the following items, either as end products or components, that have been grown, reprocessed, reused, or produced in the United States: … [including] (2) clothing and the material components thereof… (4) cotton and other natural fiber products… (5) woven silk… (6) spun silk yarn… (7) synthetic fabric… (8) canvas products… (9) wool… [and] (10) any item of individual equipment manufactured from or containing fibers, yarns, fabrics, or materials listed [above]." DFAR § 252.225-7012 (implementing language as required by DFAR § 225.7002-3).

35.     Despite several differences between the Buy American Act and the Berry Amendment, they each require that certain products purchased by and supplied to the United States be manufactured in the United States. Both laws are designed to foster and protect American industry, American workers, and American invested capital.

36.     A product is "manufactured" when the operations performed on it create a new material or result in a substantial change in physical character. "Manufacture" may involve a mechanical operation, or it may involve the assembly of components into a new product. For bags, belts, and other types of apparel and accessories, the determinative manufacturing process is the assembly of pieces into a deliverable product.

37.     The United States Customs and Border Protection Agency, which is part of the Department of Homeland Security, releases advisory rulings related to a product's country of origin for the purposes of tariffs and government procurement under the BAA.  Many of the products in these rulings are the same type of textile products supplied by the Defendants to the United States.  These rulings establish that textile products such as backpacks, vests, belts, and bags are considered products of the country in which they were assembled.  Subsequent modifications, such as the attachment of buckles, are considered minor and do not alter a fully-assembled product's country of origin.

38.     The General Services Administration ("GSA") is a federal agency charged with assisting other agencies in procuring products, including textiles.  To facilitate transactions, the GSA has an online shopping and ordering system called GSA Advantage!.  Vendors who seek to offer products through the GSA Advantage! website must certify that their products comply with the BAA, the TAA, and the Berry Amendment.

39.     In addition to being important statutory requirements that protect American troops, laborers, and the economy at large, compliance with the above laws is expressly required by default in all procurement contracts and is material to the government's decision to pay claims for the products sold by suppliers to the United States.  As a condition of eligibility to receiving federal funds, suppliers must submit either a certificate of compliance or a certificate of non-compliance with the BAA or the TAA.  Federal grantees require that these certificates be submitted prior to a supplier's participation in the bidding process (in the case of a bidding procurement) or be attached to a supplier's final offer (in the case of a negotiated procurement).  After submitting a BAA or a TAA certificate, suppliers are bound by their promise and cannot seek waivers.  Rather, they must continue to supply domestic products (or products from

qualifying countries) throughout the course of the agreement. In the case of the Berry Amendment, suppliers can only provide the United States with products that are grown, reprocessed, reused, or produced in the United States, as all other products are ineligible for acquisition.

40. Because the government would not pay for products that did not comply with the BAA, the TAA, or the Berry Amendment, suppliers violate the False Claims Act when they misrepresent the origin of their products yet certify their compliance with these laws.

## V.     **DEFENDANTS' FRAUDULENT SCHEMES**

41. Since at least 2008, Defendants have knowingly sold products to the United States that are manufactured by LBT in Peru, Mexico, and China in contravention of the BAA, the TAA, and the Berry Amendment, while LBT held itself out as a "Berry compliant" company whose products are "100% made in America."

42. LBT, at the direction of David Bohannon, exports fabric and associated components to countries such as Peru, Mexico, and China where foreign workers in foreign facilities assemble the fabric and associated components together into a finished product. The products are then shipped back to the United States, often with stickers or tags that state "Made in Peru/Mexico/China," where LBT, at Bohannon's direction, removes the foreign labels and replaces them with LBT labels that read "Made in USA."

43. Relator Keating is intimately familiar with the sewing and assembly processes that LBT is outsourcing to foreign countries. She began working at LBT in May 2002 as a sewing machine operator. In that position, her job duties included many of the manufacturing processes that LBT now outsources to foreign vendors, including sewing and assembly of backpacks, belts, bags, vests and other clothing and accessories.

44.     In November 2002, Relator Keating became supervisor of a sewing team.  LBT expanded operations in 2004 and Relator was again promoted, becoming supervisor of four sewing teams.  LBT's business grew quickly during this time, and the backpacks that LBT supplied to the United States military were one of the company's primary products.

45.     Relator Keating currently works for LBT as supervisor of the company's automation department.  Her job duties include overseeing, directing, designing and maintaining various plant operations, as well as monitoring and evaluating employee performance.

46.     Since at least 2008, Relator Keating has observed that LBT has increasingly outsourced its manufacturing to countries like China, Peru, and Mexico, while nevertheless holding itself out as a "Berry Compliant" company whose products are "100% made in America and always will be."

### Facts

47.     In 2008, Relator Keating observed incoming shipments of fully-manufactured black "loadout bags" with "Made in China" labels.  Over the next year, Relator witnessed thousands of these bags arriving to LBT's facilities in boxes that displayed Chinese characters.  These bags are heavy-duty duffels which cost up to several hundred dollars apiece.  For example, the LBT-2466A loadout bag is currently listed for $331.09 on GSA Advantage!.

48.     Relator Keating saw employees Jose Delgado and Carol Hanlon removing the "Made in China" tags from the loadout bags and replacing them with LBT labels that read "Made in USA."

49.     Through 2012, LBT continued to outsource its manufacturing operations to Peru and, as a result, laid off approximately thirty employees.  Relator Keating asked why a company that manufactures American-made products would lay off American workers while outsourcing

its manufacturing operations to a foreign country. She was told by Ken Beasley, LBT's Vice President and Production Manager, that Defendant Bohannon was directing those changes.

50.     In January 2014, Ms. Keating saw employee Cindy Adkins removing "Made in Peru" labels from 1476A Black Backpacks and replacing them with LBT's "Made in USA" tags. When questioned by Relator, Adkins said that she was following the orders of her supervisor, Matilda Graves.

51.     As this conduct continued, Relator saw supervisor Matilda Graves herself switching tags. Employees Cindy Adkins and Claudia Parlett assisted her with this task.

52.     In February 2014, Relator saw Ken Beasley open a large box of medical pouches that were individually labeled "Made in Peru." Beasley directed Adkins and Tonya McNeal to remove the manufacturer's label and give the pouches to employee Angela Glenn, who replaced them with LBT tags that read "Made in USA."

53.     Ms. Keating told Beasley this was illegal, but he told her that Bohannon had ordered it. The conduct continued.

54.     In 2015, LBT expanded its outsourcing operations to Mexico. Afterwards, fully-manufactured products began to come into LBT's facilities from its operations in Mexico. These products carried "Made in Mexico" labels, which LBT continued to remove and replace with LBT's own labels that read "Made in USA."

55.     After Ms. Keating voiced her concerns, many fully-manufactured products began arriving in LBT's facilities with the true manufacturer's labels already removed. However, the location where the labels were once affixed was clearly visible when the products arrived at LBT, so LBT directed its employees to cover the area with an LBT label that read "Made in USA."

56.     Many products were shipped straight to LBT's "Viking warehouse/Resource Center" before being shipped to LBT's customers. The "Viking Warehouse/Resource Center" is a locked building that is located away from LBT's main facility, and to which most LBT employees do not have access. Relator Keating believes that the Defendants utilize the Viking Warehouse as a secured storage facility in furtherance of their fraudulent scheme to sell foreign-made products as "American-made" goods.

57.     On September 22, 2015, Relator notified Chris Enderly, LBT's Scheduler, that a shipment of Peruvian-made belts had been manufactured too short – 52½" instead of 53¼". Enderly's response was that there was "not much we can do about it at this point, other than let Peru know for their next round."

58.     On June 15, 2016, Supervisor Graves told Ms. Keating to affix LBT's "Made in USA" labels to an order of 612C Uniform Belts that were manufactured in China. When Relator questioned the legality of putting "Made in USA" labels on Chinese-made belts, LBT decided to simply remove the "Made in USA" label and sell the belts without reference to their place of manufacture.

59.     Relator also observed that the Chinese belts were improperly manufactured. Specifically, the buckles had been put on wrong, such that the flange on the sliding bar was in the direction of the webbing instead of facing the front edge of the buckle. Chris Enderly told Relator that Beasley and Bohannon were aware of this defect but that they were nevertheless going to put the belts through without correcting the buckle.

60.     Relator continues to observe shipments of fully-assembled products arriving from manufacturing facilities in Peru, Mexico, and China. In some cases, the boxes that contain the

shipments of fully-assembled products have the true manufacturers' logos printed on the outside of the box. Relator has witnessed and recorded examples of these shipments.

61.     For example, on July 21, 2016, Ms. Keating observed a cart containing fully-assembled plate carrier vests (Model 6094) and magazine pouches (Model 9010-A) that had recently arrived from manufacturing facilities in Mexico. Defendant LBT supplies many of these vests to Defendant ADS, who in turn supplies the vests to the United States. On these particular vests, the "Made in Mexico" tags were affixed by a single stitch, making the tags easy to remove and replace. Clarita Johnson, an LBT Quality Assurance employee, remarked to Relator that the job was a poorly made "cluster" and questioned why LBT would have ever sent fabric to Mexico.

62.     While raising concerns about the quality of LBT's products, Relator learned that Defendant ADS recommended or directed that LBT outsource its manufacturing to Mexico, claiming that it would be a "good deal."

63.     Defendants do not substantially transform or re-manufacture any of the fully-manufactured products that they receive from foreign countries and label as "Made in USA." However, Defendants regularly change the "job identification" numbers in their internal system so that jobs once designated as being manufactured in Mexico or Peru instead display identification numbers that imply domestic manufacture.

64.     Each of the fully-assembled products contained in the shipments either carries labels that say "Made in Peru/Mexico/China," or carries no label at all. In either case, LBT always places its own label on the products and removes or covers all traces of the true manufacturer's label prior to shipping the products to its customers, including the United States.

**Defendant's Electronic Databases Reveal the Illegal Conduct**

65.     Ms. Keating routinely observes databases and spreadsheets on LBT's internal "M1" computer system that reveal the origin of Defendants' products.

66.     The M1 System designates places of manufacture for each product by appending a numerical code to the front of a product's job number.  For example, Peruvian-made products are identified with the prefix "7," and Mexican-made products are identified with the prefix "M." However, Relator knows that many products with the prefix "2," which is supposed to indicate domestic manufacture, are actually manufactured in foreign countries such as China, which has no designated prefix, as well as Mexico and Peru.

67.     The M1 System also incorporates scheduling activities and timecard information for each employee, tracking the time each employee spends on an assigned job at LBT.  The M1 System generates a "traveler" for each product, which lists the tasks needed to complete a particular product and allows LBT employees to track the work they perform on that product. Consistent with LBT's practice of outsourcing assembly processes to foreign countries, many travelers – even those with the "2" prefix – state that the only sewing that needs to be performed on products in LBT's facilities is the attachment of LBT's "Made in USA" labels to fully-manufactured products arriving from foreign countries.

68.     The M1 System also allows for the entry of "Production Notes," which allows LBT to insert directions related to the products LBT is shipping to its customers.  Sometimes, these production notes contain instructions that are consistent with the practices that Relator Keating had personally observed since at least 2008.  One such note for an order of 1,265 medical pouches reveals that the shipment "came back from Peru 47 short." Another note, this one related to an order for backpacks identified by the job number 730645 (the "7" meaning that

it was to be manufactured in Peru), stated that "These are being cut and kitted here to be shipped. No Labels, Automation, or Sewing required!!!"

69.      The M1 System also utilizes "Work Center Identification Numbers" to represent the type of work being performed on a product.  Among these IDs are designators for foreign manufacturing operations, including "MEX" (Mexico Sewing), "PERFA" (Peru Final Assembly), "PERHD" (Peru Hardware), "PERU" (Peru Sewing), and "PERU2" (Peru Sewing w/ LBT Needs).

70.      One of Ms. Keating's duties at LBT is to review the travelers and approve the timecards submitted by LBT employees, which are tracked in the M1 System.  She has observed many time entries in the M1 System for which no employee has recorded any time for manufacturing the associated products.  For example, Ms. Keating has identified a timesheet which reveals that no time was spent on the manufacture of an order for LBT backpacks, identified with the job number 730737, and that the only time recorded by LBT employees was for cutting the fabric and kitting the components to be shipped to Peru for assembly.  Another timecard, related to job number 749340, lists the work center where the product was manufactured as "PERU – Peru Sewing" and the process as "PERU – Peru Operations."

### Defendants' Business with the United States

71.      Defendants sold these foreign-made products to the United States as if they were manufactured in compliance with the BAA, the TAA, and the Berry Amendment.  Defendant LBT also continues to market its products as "Berry compliant" and as "Manufactured in the United States of America," both on its own website and on GSA Advantage!.

72.      Defendants' internal pricing lists regarding sales to the United States contain all of the products that Relator has noted are actually manufactured in foreign countries.

16

73.     Defendants' supply schedule and price list with the GSA (through which it sells items on the GSA Advantage! website) also contain the products that Relator has noted are actually manufactured in foreign countries, even though the list indicates that "All items are manufactured in the USA."

74.     The government relies on Defendants' assertions, promises, and certifications that LBT's products are manufactured in compliance with the BAA, the TAA, and the Berry Amendment when it purchases Defendants' products for use in the United States and elsewhere, and in sufficient dollar amounts to trigger the application of these laws. Defendants' representations of compliance are material to the government's decision to pay claims.

75.     Since 2008, Defendant LBT has sold more than $2.95 million worth of textile products directly to the United States, many of which Relator believes were manufactured (at the direction of Defendant Bohannon) in Peru, Mexico, or China in violation of the BAA, the TAA, and the Berry Amendment.

76.     Since 2008, Defendant ADS has sold more than $1.28 billion worth of textile products to the United States, many of which Relator believes were supplied by Defendant LBT and manufactured (at the direction of Defendant Bohannon) in Peru, Mexico, or China in violation of the BAA, the TAA, and the Berry Amendment.

77.     By way of example, the government contracted to purchase body armor from ADS on April 7, 2016. A record of this contract reveals that ADS was to supply the government with LBT's plate carrier vests (Model 6094). As mentioned above, in July 2016 Relator saw a large order of these vests come into LBT's facility from Mexico, their job order number beginning with the "M" designator. Furthermore, LBT's "Production Notes" for the order indicate that the vests were defective because they were not manufactured to hold the type of

plate armor for which their use was intended.  Another LBT employee, Darlene Randell, also remarked on the poor quality of the job and told Relator that she did not understand why LBT was sending fabric to Mexico to be assembled into a finished product of such inferior quality. On information and belief, Defendants intended to sell these non-compliant vests to the United States.

78.    By way of further example, Relator has identified a recent order for 700 jump bags (i.e., packs that are worn when jumping out of an aircraft) (Model LBT-0101J-AS) in Defendants' M1 system with a job number that uses the "M" designator (indicating manufacture in Mexico).  The customer for this order is Airborne Systems of North America CA, a company that supplies parachutes and associated equipment to the United States.  Airborne's website contains a clear statement to vendors and subcontractors:  "Airborne Systems North America prides itself in meeting or exceeding all United States Government Procurement regulations… any and all contracts that contain [the Berry Amendment] must be manufactured, reprocessed, or grown in the United States only."  However, after LBT made minor modifications to the bags – specifically, the addition of a small D-ring strap and a jump line – it changed the job number in its M1 computer system so that it began with a "2" designator, thereby concealing the products' true place of manufacture in Mexico.

79.    By way of further example, Relator has identified an order for 1,265 Medical Pouches (Model LBT-0250) with a job number that begins with "7" (indicating manufacture in Peru).  The customer for this particular order is Defendant ADS.  The Description on this order reads, "Pouch, Medical, *Department of State*, Pull Tab" (emphasis added), and the Production Notes read, "1218 receipted… on 11/16, came back from Peru 47 short."  Furthermore, Relator has witnessed "Made in Peru" tags being removed from these types of products and replaced

with LBT tags that read "Made in USA." The same or similar pouches are also listed for sale on GSA Advantage! for up to $55.31 apiece. The pouches' product description on GSA Advantage! indicates that the pouches are "Made in [the] United States of America," with LBT listed as the manufacturer and Defendant ADS listed as the contractor who fulfills the orders.

80.     By way of further example, Relator has identified one of LBT's Scheduling Boards containing orders for 38,740 belts, slings, and ammunition pouches with the job numbers that begin with "M" (indicating manufacture in Mexico) that were recorded in LBT's M1 System between October 19, 2015 and April 26, 2016. The machine on which these products were made is listed as "Mexico Sewing, Machine 1." Relator has seen "Made in Mexico" tags being removed from these types of products and replaced with LBT tags. The same products are also listed for sale on GSA Advantage! at various prices. The products' descriptions on GSA Advantage! indicate that they were "Made in [the] United States of America," with LBT listed as the manufacturer and Defendant ADS listed as the contractor who fulfills the orders.

81.     Relator identified orders for more than 23,000 ammunition pouches (Model LBT-9010A) and 2,600 belts (Model LBT-0621), both under the category "Peru Sewing," that were recorded in LBT's M1 System between November 5 and December 8, 2015. All of these belts and pouches have job numbers that begin with a "7" (indicating manufacture in Peru), and Relator has seen "Made in Peru" tags being removed from these types of products and replaced with LBT tags. The same pouches are also listed for sale on GSA Advantage! for $27.87 apiece. The pouches' product description on GSA Advantage! indicates that the pouches were "Made in [the] United States of America," with LBT listed as the manufacturer and Defendant ADS listed as the contractor who fulfills the orders.

82.     By way of further example, Relator identified orders for over 20,000 weapon slings (Model LBT-2500) that were recorded in LBT's M1 System between October 16 and October 30, 2015.  Some of these slings have job numbers that begin with an "M" (indicating manufacture in Mexico), but most have job numbers that begin with "2."  All of the slings, however, are categorized under "Mexico Sewing."  The same slings are also listed for sale on GSA Advantage! for $27.87 apiece.  The slings' product description on GSA Advantage! indicates that the slings were "Made in [the] United States of America," with LBT listed as the manufacturer and Defendant ADS listed as the contractor who fulfills the orders.

83.     By way of further example, Relator identified orders for over 46,904 backpacks (Model LBT-1476) that were recorded in LBT's M1 System between December 2012 and May 2016.  Most of these backpacks have job numbers that begin with a "7" (indicating manufacture in Peru) or a "2," and Relator has seen "Made in Peru/Mexico" tags being removed from these types of products and replaced with LBT tags.  The same or similar backpacks are also listed for sale on GSA Advantage! for $145.96 apiece.  The backpacks' product description on GSA Advantage! indicates that the backpacks were "Made in [the] United States of America," with LBT listed as the manufacturer and Defendant ADS listed as the contractor who fulfills the orders.

84.     Defendants offered these products for sale to the United States as "Made in the USA" and "Berry Compliant," even though they knew that the products were manufactured in foreign countries.

85.     The government paid Defendants for products from LBT that did not comply with the law or meet the material specifications outlined in Defendants' contracts with the government, and Defendants retained these payments despite knowing that they had fraudulently

misrepresented the character of their products and falsely certified their compliance in a manner material to the government's decision to pay claims.

86.     As a result of selling products whose countries of origin were concealed by Defendants and presented as "Made in USA," Defendants knowingly submitted or caused to be submitted false claims for payment or false statements in support of false claims for payment to the United States.

87.     By stating that their products were "Made in USA," "Berry Compliant," or otherwise conformed to the specifications required in their contracts with the United States, Defendants knowingly submitted or caused to be submitted false and fraudulent statements in support of contracts to the United States.

88.     Each time Defendants present a claim for payment to the United States for foreign-made products, they falsely certify that they are complying with the fundamental, material terms and obligations of their contracts with the United States, including compliance with the BAA, the TAA, and the Berry Amendment.

89.     Each sale to the United States of textiles that are manufactured in Peru, Mexico, or China constitutes a material misrepresentation of compliance and is thus a false claim in violation of the False Claims Act.

**COUNT I**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A), (B), and (G)**

90.     The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

91.     The False Claims Act, 31 U.S.C. § 3729, imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval; those who

make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government; and those who knowingly conceal, improperly avoid, or decrease an obligation to pay money to the government.

92.     Defendants knowingly and willfully violated the FCA by failing to comply with the material conditions imposed by BAA, the TAA, and the Berry Amendment. Specifically, Defendants offered and sold to the United States so-called "American-made" products that were actually manufactured in foreign countries, including Peru, Mexico, and China. Defendants, who marketed their goods as "100% made in America," concealed their products' true places of manufacture by removing the manufacturers' tags and replacing them with tags that stated "Made in USA." As a result, Defendants knowingly made or caused to be made material misrepresentations to the United States regarding their compliance with the law and with their contractual obligations, resulting in the submission of false claims.

93.     Defendants' actions, if known, would have materially affected the United States' decision to pay the resulting claims.

94.     To be eligible to do business with the United States, Defendants were required to submit certificates of compliance (or noncompliance) with the BAA and the TAA and provide products that conformed with those certifications. Under the Berry Amendment, Defendants were required to provide the United States solely with goods that were manufactured in the United States.

95.     Defendants' obligation to provide American-made products under the BAA, the TAA, and the Berry Amendment was explicitly specified by contract and was thus material to the government's decision to pay claims for the product the Defendants provided.

96.     Each claim for products that did not comply with the BAA, the TAA, or the Berry Amendment was a false claim that Defendants knowingly presented to the government for approval and payment, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

97.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, material to a false or fraudulent claim for payment, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

98.     By virtue of the acts described above, Defendants received overpayments from the United States for products that did not comply with the BAA, the TAA, or the Berry Amendment.  Defendants failed to return the money received through these claims to the government in a timely manner.  Defendants' ongoing and knowing failure to report these overpayments violates the False Claims Act, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

99.     The United States, unaware of the falsity of Defendants' claims, records, and statements, paid claims that would not be paid but for Defendants' unlawful conduct.

100.    Because the United States would not have paid for products which it knew to have violated the BAA, the TAA, or the Berry Amendment, the United States has been harmed in an amount equal to the value paid by the government for these products.

101.    Through the explicit language of the BAA, the TAA, and the Berry Amendment; the mandatory conditions of Defendants' contracts with the United States; the required express certifications of compliance; and the repeated admonitions of advisory rulings, Defendants knew that compliance with the BAA, the TAA, and the Berry Amendment was material to the government's decision to pay claims.

102.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator seeks judgment against the Defendants as follows:

A.      That Defendants cease and desist from violating the False Claims Act.

B.      That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained due to Defendants' actions, plus a civil penalty not less than $10,781 and not more than $21,563 for each violation of 31 U.S.C. § 3729;

C.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

D.      That Relator be awarded all costs and expenses of this action, including attorneys' fees and expenses;

E.      That Relator recover such other relief as this Court deems just and proper.

Respectfully submitted,

Of Counsel:

| | |
|---|---|
| Jeremiah A. Denton III | Frederick M. Morgan, Jr. (0027687) |
| Jeremiah A. Denton IV | Trial Attorney |
| Jeremiah A. Denton III, P.C. | Jennifer M. Verkamp (0067198) |
| 477 Viking Drive, Suite 100 | Morgan Verkamp LLC |
| Virginia Beach, VA 23452 | 35 East 7th Street, Suite 600 |
| Tel: 757/340-3232 | Cincinnati, OH 45202 |
| Fax: 757/340-4505 | Telephone: (513) 651-4400 |
| jerry@jeremiahdenton.com | Fax: (513) 651-4405 |
| jake@jeremiahdenton.com | rmorgan@morganverkamp.com |
| | jverkamp@morganverkamp.com |

*Counsel for Relator Ann Keating*

**DO NOT SERVE**
**FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL**